IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| YANINA SEMENOVICH*,* | ) |
| | ) |
|     Plaintiff | ) |
| | ) |
|        v. | )     1:14cv1780 (JCC/MSN) |
| | ) |
| PROJECT PERFORMANCE COMPANY, | ) |
| INC., | ) |
| | ) |
|     Defendant. | ) |

## M E M O R A N D U M   O P I N I O N

This matter is before the Court on Defendant Project
Performance Company's ("PPC" or "Defendant") Motion or for
Summary Judgment.  [Dkt. 41.]  For the following reasons, the
Court will grant the Defendant's Motion for Summary Judgment in
part and deny the motion in part.

### I. Background

Plaintiff Yanina Semenovich ("Plaintiff") was an
employee of Defendant PPC from July 2009 until June 7, 2012.
(Pl.'s Mem. in Opp. [Dkt 49] at 1.)  PPC is an information
technology and management consulting firm, whose primary
business consists of contracting out skilled consultants to
clients and billing them hourly.  (Def.'s Mem. in Supp. [Dkt.
47] at 3.)  PPC relies on its employees to track and report
their hours worked on a daily basis, filling out a timecard

1

recording both hours worked on billable accounts and hours worked on non-billable, internal matters. (*Id.* at 4.) If an exempt employee failed to enter any time for a particular workweek, then PPC's payroll department would have no way of knowing that employee performed any work during that week, and the employee would receive no pay for that workweek. (*Id.*)

Plaintiff was originally hired as a Principal Analyst with a starting salary of $105,000 a year. Her first role at PPC was as a project manager on the "Tokyo Millennium" reinsurance company account. (Pl.'s Mem. in Opp. at 8.) At the time of her interview, that account was run by Principal Michael Fleckenstein, also an employee of PPC. (*Id.*) Semenovich received decent performance reviews her first several years at PPC, and received several increases in salary. (*Id.* at note 21.) Plaintiff ultimately reached a salary of $113,000 a year in 2013. (*Id.*) However, Plaintiff began to worry and complain about her lack of promotion within PPC and began to voice those concerns to management sometime in late 2010 or early 2011. (*Id.* at 11-12.) During this time, PPC underwent several reorganizations and the practice to which Plaintiff was originally hired was disbanded. (Def.'s Mem. in Supp. at 7.) Plaintiff was left without a practice or a direct supervisor, so Plaintiff began working as a kind of floater, moving across divisions and practices and providing advisory technical

2

services or strategic support to other groups. (*Id.*) While Plaintiff's work still received good reviews, very little of it was billable in this new role. (*Id.*) Plaintiff's billable rate in December 2011 reached only 16%. (Pl.'s Mem. in Opp. at Note 73.) During that same period, late 2011, Plaintiff became extremely unreliable in submitting her timecards on a daily basis as required by company policy. (Def.'s Mem. in Supp. at 7-8.) In October 2011, PPC hired Michael Freeman to be its new CEO in an effort to turn around the company's worrisome financial situation. (*Id.*) In November 2011, PPC underwent a reduction in force which led to a large reorganization and the promotion of Zach Wahl to Vice President. (*Id.*) Plaintiff was distraught that she had not been awarded the Vice President position, and she confronted Dale Tuttle, PPC's Chief Technological Officer about the decision to promote Wahl. (Pl.'s Mem. in Opp. at 13.)

Under Michael Freeman, PPC and their new CFO, Dan Rice, began to crack down on the amount of overhead labor costs by closely monitoring which employees were being paid without bringing in money for PPC. (Def.'s Mem. in Supp. at 8.) The new management team was concerned about Plaintiff's role with the company because of her chronically low billable rate and her heavy use of overhead. (*Id.*) They were also concerned by the Plaintiff's lack of experience leading projects or supervising

3

teams. (*Id.*) Additionally, by Fall of 2011, Plaintiff had exceeded her paid leave allotment and accumulated a high amount of negative leave by taking paid leave that she had not yet earned. (*Id.*) In November 2011, Freeman told Chief Information Officer Tony Cicco and Vice President of Human Resources Jennifer Gertenbach that Plaintiff's current situation was untenable and they needed to either find her a productive role or let her go. (*Id.*) Throughout the late fall and winter of 2011 Cicco and Gertenbach attempted to put Plaintiff in touch with various teams at PPC which might have had a role for her. (*Id.* at 10.) In early January 2012 Plaintiff was told by Ms. Gertenbach that if she did not find billable work soon, her employment might be terminated. (*Id.*)

In mid-January 2012, Plaintiff reached out to Nathan Smith regarding potential work on a bid proposal to the Environmental Protection Agency ("EPA"). (*Id.* at 11.) This eventually led to Plaintiff working on that project and receiving compensation for time worked in that capacity from March 8, 2012 to March 28, 2012. (Pl.'s Mem. in Opp. at 15.) Plaintiff was subsequently listed as a "key person" on the resulting bid proposal to the EPA. (*Id.* at 2.)

However, Plaintiff did not receive a pay check for the pay periods between November 16, 2011 and March 7, 2012, or for the pay periods between March 29, 2012 and July 7, 2012. (*Id.* at

13-14; Def.'s Mem. in Supp. at 26.)  During those time periods, Plaintiff either did not submit timesheets, or submitted timesheets indicating that she was on leave without pay ("LWOP"). (Def.'s Mem. in Supp. at 26.)  Plaintiff contends that she was continuing to work during this time, and was submitting her timesheets indicating LWOP only because she was not provided with a valid charge code by Defendant.  (Pl.'s Mem. in Opp. at 14.)  Defendant, on the other hand, argues that the Plaintiff was not performing any work for the company during these time periods.  (Def.'s Mem. in Supp. at 26, 29.)

In April of 2012, Defendant transferred Plaintiff to Mr. Smith's "Energy, Environment, and Climate Solutions" division.  (*Id.* at 11.)  On April 19, 2012, Mr. Smith emailed Ms. Gertenbach informing her that Plaintiff had declined to join his division.  (Romansic Decl. [Dkt. 43-1] Ex. 18.)  On April 17, 2012, after an e-mail conversation with Ms. Gertenbach regarding Plaintiff's incomplete timesheets, Plaintiff submitted a "demand letter" to Defendant's CEO, Mike Freeman. (*Id.* at Ex. 41, Ex. 19.)  In her demand letter, Plaintiff notified Defendant that she had been in touch with an attorney, accused Defendant of a "long time pattern of discrimination and discriminatory promotion practices," and demanded a promotion to "Vice President of Strategic Technology" and a retroactive pay increase.  (*Id.* at Ex. 19.)  Mr. Freeman referred the matter to

Ms. Gertenbach for handling. (Def.'s Mem. in Supp. at 14.) On April 19, 2012, Ms. Gertenbach informed Plaintiff that Defendant would be conducting an investigation into the claims made in the demand letter, asked Plaintiff when she would be available to meet, and told Plaintiff to refrain from performing any work duties for PPC until the complaint was resolved. (Romansik Decl. Ex. 21.) When Plaintiff responded, she informed Defendant that she was only willing to meet with her husband present. (*Id.*) Defendant informed Plaintiff that her husband would not be permitted to attend the meeting, and Plaintiff ultimately decided against attending the meeting. (*Id.*) On April 27, 2012, an attorney representing Plaintiff informed Defendant that Plaintiff intended to pursue legal action. (*Id.* at Ex. 22.)

That same day, April 27, 2012, Plaintiff was informed that Defendant had won the EPA contract she had been working on that March. (Pl.'s Mem. in Opp. at 16.) On May 8, 2012, Defendant requested the EPA's approval to remove Plaintiff as a key person on the EPA contract. (Romansik Decl. Ex. 24.) On May 14, 2012, Plaintiff sent an email titled "final notice" to John Lowry, the CEO of Defendant's parent company. (*Id.* at 27.) In this email, Plaintiff complained about her removal from the EPA contract and stated that she would pursue legal action

unless Defendant accepted her salary and promotion demands within two days.  (*Id.*)

Defendant was unwilling to concede to Plaintiff's demands, and on June 7, 2012, Defendant informed Plaintiff that they were terminating her employment effective immediately. (Def.'s Mem. in Supp. at 17.)  On December 24, 2014, Plaintiff brought this suit alleging discrimination in violation of Title VII of the Civil Rights Act of 1964, the creation of a hostile work environment in violation of Title VII, retaliation for engaging in a protected activity in violation of Title VII, unpaid wages in violation of the Fair Labor Standards Act, and breach of implied contract stemming from unpaid wages.  (Am. Compl. [Dkt. 23] ¶¶ 48-76.)  After discovery, Defendant filed this motion for summary judgment.  The matter has been briefed and argued, and it is now ripe for decision.

## II. Legal Standard

Summary judgment is appropriate only where, on the basis of undisputed material facts, the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  In reviewing the record on summary judgment, "the court must draw any inferences in the light most favorable to the non-movant [and] determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre*

7

*Computer Ctrs.,* 933 F.2d 1253, 1259 (4th Cir. 1991)(citations omitted).

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *see also Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 299 (4th Cir. 2012).

### III. Analysis

The Plaintiff brings five counts alleging, respectively, (i) gender discrimination in violation of Title VII, (ii) the creation of a hostile work environment in violation of Title VII, (iii) retaliation for engaging in a protected activity in violation of Title VII, (iv) improper withholding of wages in violation of the Fair Labor Standards Act, and (v) breach of implied contract stemming from unpaid wages. (Am. Compl. ¶¶ 48-76.) The Court addresses each of those claims in turn.

A.   Plaintiff's Gender Discrimination Claim

Count I of Plaintiff's complaint alleges that "Defendant discriminated against the Plaintiff on the basis of sex in violation of Title VII by denying the Plaintiff equal terms and conditions of employment and/or by terminating her." (Compl. ¶ 50.) Because Plaintiff offers no direct evidence of

discrimination, her gender discrimination claims are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-805 (1973).  Under the *McDonnell Douglas* framework, the plaintiff must first prove a prima facie case of discrimination, then the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason for the employee's rejection."  *Id.* at 802.  If the defendant is able to articulate a legitimate reason for the adverse employment action, then the burden shifts back to the plaintiff to demonstrate, by a preponderance of the evidence, that the offered reason was merely a pretext for discrimination.  *Id.* at 804.

In order to prove a prima facie case of gender discrimination under Title VII, a plaintiff must establish that:

> (1) she is a member of the protected class, (2) she suffered an adverse employment action, (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action, and (4) the position remained open or was filled by similarly-qualified applicants. . . outside the protected class.

*Jyachosky v. Winter*, 343 F. App'x 871, 876 (4th Cir. 2009) (citing *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007)); *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 513 (4th Cir. 2006).

Title VII also requires that "an EEOC charge must be filed within 300 days after the alleged unlawful employment practice occurred." *Tomasello v. Fairfax Cty.*, No. 1:15-cv-95, 2016 WL 165708, at *7 (E.D. Va. Jan 13, 2016) (citing 42 U.S.C. § 2000e-5(e)(1)(Title VII)). Claims stemming from allegedly discriminatory or retaliatory acts which occurred more than 300 days prior to the filing of an EEOC charge are time barred. Plaintiff's EEOC charge was filed on October 11, 2012. Any alleged discriminatory or retaliatory conduct must therefore have occurred no earlier than December 16, 2011, 300 days prior to Plaintiff's filing the EEOC charge. Any claims stemming from allegedly discriminatory or retaliatory acts occurring before December 16, 2011 are therefore time-barred.

Plaintiff's allegations about being passed over for promotion in November 2011 stem from actions which took place before December 16, 2011 and are time barred. The only alleged adverse actions which occurred within 300 days of Plaintiff filing her EEOC complaint were her removal from the "key person" listing on the EPA contract and her termination by PPC. In order to constitute an adverse employment action, there must be a "decrease in compensation, job title, level of responsibility, or opportunity for promotion." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004). Defendant concedes

that both removal from the EPA listing and termination were adverse employment actions.

While Plaintiff is a member of a protected class and was subject to an adverse employment action, she is unable to prove that "she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action," the third element of a prima facie case for gender discrimination. *Jyachosky*, 343 F. App'x at 876. Plaintiff points to her performance reviews as evidence that she was performing her job up to her employer's legitimate expectations. However, ample evidence in the record demonstrates that by 2012, Plaintiff's billable rate had reached an unacceptably low level, Plaintiff routinely failed to follow company policy regarding filling out her timesheet, and Plaintiff showed little interest in taking on a role which was more geared towards billable work. Moreover, the documents detailing the Defendant's concern over Plaintiff's billable rate predate Plaintiff's removal from the EPA key person listing or Plaintiff's firing, indicating that they were not manufactured after Plaintiff's departure to serve as a pretext.

Even drawing all inferences in the light most favorable to Plaintiff, the Court cannot conclude that Plaintiff can demonstrate she was performing her duties at a level that met her employer's legitimate expectations when she was removed

from the EPA contract and subsequently fired given Defendant's serious, documented concerns about Plaintiff's billable rate and time-card practices.  Accordingly, Plaintiff cannot maintain an action for gender discrimination, and the Court grants Defendant's motion for summary judgment with respect to this claim.

    B.   Plaintiff's Harassment Claim

        Plaintiff's Count II alleges that "Defendant PPC created a hostile work environment when it withdrew all job assignments from the Plaintiff" because of her gender.  (Compl. ¶ 54.)  In order to succeed with an action for hostile environment sexual harassment, a plaintiff must show conduct that "(1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer."  *Ocheltree v. Scolion Prods., Inc.,* 335 F.3d 325, 331 (4th Cir. 2003).  Plaintiff has clarified that she is proceeding on the theory that PPC "excluded [Plaintiff] from important areas of the workplace" by failing to provide her with work assignments between November 24, 2012 and July 7, 2012, apart from a three week period where PPC allowed Plaintiff to work on the EPA proposal.  (Pl.'s Mem. in Opp. at 6, 26.) "[T]he *sine qua non* of a hostile work environment claim is the presence, in the workplace, of . . . offensive remarks or other

actions that are, in and of themselves . . . insulting." *Dawson v. Rumsfeld*, No. 1:05-cv-1270 (JCC), 2006 WL 325867, at *4 (E.D. Va. Feb. 8, 2006); *Bush v. Hagel*, 2014 WL 345650, at *9 (E.D. Va. 2014), *aff'd* 597 F. App'x 178 (4th Cir. 2015) (finding plaintiff failed to state a claim for race based hostile work environment as a matter of law where "there is no evidence of any racial slurs or insults of any kind being used toward plaintiff, nor was plaintiff in any way physically threatened"). The kind of conclusory allegations about a general, vaguely hostile atmosphere towards a particular employee made here are not enough to sustain a hostile environment claim without specific evidentiary examples of incidents of harassment motivated by plaintiff's protected characteristics or actions. *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998). Accordingly, even if the Plaintiff's harassment claim is reasonably related to the gender discrimination claim submitted to the EEOC, Plaintiff cannot succeed on the merits of a harassment claim and the Court grants Defendant's motion for summary judgement as to Count II of the amended complaint.

    C.   <u>Plaintiff's Retaliation Claim</u>

       Plaintiff's Count III alleges that "[a]s a result of her protected activity and opposition to practices made unlawful under Title VII, Plaintiff was subjected to an adverse employment action, upto [sic] and including termination."

(Compl. ¶ 61.)  Claims for retaliation, like claims for
discrimination, are subject to the *McDonnell Douglas* burden
shifting framework.  In order to establish a *prima facie* case of
retaliation, a plaintiff must show "(i) that she engaged in
protected activity, (ii) that her employer took adverse action
against her, and (iii) that a causal relationship existed
between the protected activity and the adverse employment
action."  *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243,
249 (4th Cir. 2015)(internal quotations and alterations
omitted).

In order to engage in a protected activity under Title
VII, a plaintiff must only "prove that [she] opposed an unlawful
employment practice which [she] reasonably believed had occurred
or was occurring."  *Milladge v. OTO Dev., LLC*, No. 1:14-cv-0194,
2014 WL 4929508, at *6 (E.D. Va. Oct. 1, 2014) (quoting *Peters
v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003)).  In the case at
hand, the demand letter contained language complaining about "a
long pattern of discrimination and discriminatory promotion
practices" and it expressed Plaintiff's concerns that she had
"been exposed to retaliation as defined under Federal Title
VII."  (Romansik Dec. Ex. 19.)  A reasonable juror could
conclude that Plaintiff was opposing what she reasonably
believed were unlawful acts of gender discrimination when she
submitted this letter.  Accordingly, for the purposes of this

14

summary judgment motion, the Court accepts that the demand letter was a protected act.  Additionally, the parties agree that Plaintiff's removal from her position on the EPA contract and eventually her termination at PPC were both adverse employment actions.

Plaintiff argues that the deposition testimony of Ms. Gertenbach, Defendant's director of human resources, and Ms. Romansik, Defendant's Federal Rule of Civil Procedure 30(b)(6) corporate representative, establishes a causal relationship between Plaintiff submitting her demand letter and the subsequent adverse employment actions.  Specifically, Plaintiff points to an instance in Ms. Romansik's testimony where Ms. Romansik states that PPC made the decision to remove Plaintiff from the EPA contract and list Plaintiff as unavailable to work "based on, one, her demand letter."  (Romansik Dep. [Dkt. 49-1] 92:17-18.)  Ms. Romansik goes on to further explain that the decision was also motivated by "her refusal to work with Jennifer Gartenbach, who was head of HR, to meet and discuss the issues in the demand letter and to do an investigation."  (*Id.* at 92:20-22; 93-1.)  Defendant argues that Ms. Romansik's statement, taken in context, referred to the fact that Plaintiff was demanding a title and pay raise that Defendant had no intention of granting.  (Def.'s Reply [Dkt. 56] at 6.)  However, based on Ms. Romansik's statement, a reasonable jury could find

15

that Defendant took Plaintiff off of the EPA contract and eventually terminated her employment because of her protected activity of opposing perceived gender discrimination. Additionally, Ms. Romansik's apparent admission that Plaintiff's demand letter was the number "one" cause of Plaintiff's removal from the contract and subsequent termination is enough for a reasonable juror to conclude that the other reasons given are pretextual. Therefore, the Court denies Defendant's motion for summary judgment with regard to Plaintiff's claim for retaliation, Count III of the amended complaint.

### D.  Plaintiff's FLSA Claim

Count IV of Plaintiff's complaint alleges that Defendant violated the Fair Labor Standards Act ("FLSA") by willfully failing to pay Plaintiff for time worked during the periods of November 6, 2011 to March 7, 2012 and March 29, 2012 to July 7, 2012. (Compl. ¶¶ 66-72.) Claims brought under the FLSA are subject to a two-year statute of limitations if they involve only an ordinary violation of the FLSA, and a three-year statute of limitations if they involve a willful violation of the FLSA. *See* 29 U.S.C. § 255(a); *Desmond v. PNGI Charles Town Gaming, L.L.C.,* 630 F.3d 351, 357 (4th Cir. 2011). Defendant argues that Plaintiff's claims should be subject to the FLSA's two-year statute of limitations for ordinary violations rather than the three year statute of limitations for willful

violations of the FLSA.  Plaintiff concedes that under the two
year statute of limitations, her FLSA claims are time barred,
but she contends that Defendant's conduct constituted a willful
violation of the FLSA.

A violation of the FLSA is willful "if the employer
either knew or showed reckless disregard for whether its conduct
was prohibited." *Hantz v. Prospect Mortg., LLC,* 11 F. Supp.3d
612, 616 (E.D.Va. 2014)(citing *McLaughlin v. Richland Shoe Co.*,
486 U.S. 128, 132 (1988)).  "If an employer acts unreasonably
but not recklessly, in determining its legal obligation" to the
employee then any violation is not willful. *McLaughlin*, 486
U.S. at 135.  Thus, "[m]ere negligence on the part of the
employer with regard to compliance with the FLSA is not
sufficient to prove willfulness." *Gionfriddo v. Jason Zink,
LLC,* 769 F. Supp.2d 880, 890 (D. Md. 2011).  Ultimately, it is
the employee who bears the burden of proving that a violation is
willful. *See Desmond,* 630 F.3d at 358.  Willfulness is
"ultimately a question of fact, [but] a plaintiff must present
sufficient evidence of willfulness to survive summary judgment."
*Hantz*, 11 F. Supp. 3d at 617.

The record here unequivocally demonstrates that any
violation of the FLSA by Defendant was, at most, due to the
Defendant's negligence and miscommunication about Plaintiff's
work status with the company.  (*See* Def.'s Reply at 13-14.)

Plaintiff explained to payroll in late 2011 that she was on LWOP because, while she "was proposed a few assignments to work on at PPC," she had "not accepted them officially, and [was] still trying to negotiate what would be the best fit for me and PPC." (Romansik Decl. Ex. 18.)  When Defendant's payroll department asked why Plaintiff had failed to submit a timesheet on January 27, 2012, Plaintiff responded that "[t]here have a been a number of potential projects mentioned to me but in the meantime, I'm still on personal leave." (*Id.* at Ex. 38.)  During the second time period where Plaintiff claims to have been working without pay, March 29, 2012 to July 7, 2012, Plaintiff never logged onto the time entry system or submitted a timesheet.  (*Id.* at Ex. 66.)

During every pay period where Plaintiff did not receive a paycheck, Plaintiff either failed to submit a timesheet or submitted only timesheets showing that she was on LWOP for the entirety of the pay period.  Plaintiff alleges that this is because she was being told to perform non-billable work for Defendant but was never given a valid charge code for recording her time.  However, as soon as Defendant's human resources department learned that Plaintiff was claiming to work while billing time to LWOP, they immediately instructed Plaintiff to cease working while billing time to LWOP, as they could not permit anyone to work for free or without pay.  (*Id.*

at Ex. 42; Def.'s Mem. in Supp. at 10-12.)  Even if certain individuals employed by Defendant were engaging Plaintiff to support them in their non-billable proposal work while she was billing her time to LWOP, the messages between Plaintiff, human resources, and payroll clearly indicate that this situation was not a willful or deliberate scheme by Defendant to circumvent the requirements of the FLSA.

The record indicates that any violation of the FLSA for failure to pay the Plaintiff for time worked are the result of Plaintiff's poor timekeeping practices and a breakdown in communication rather than any reckless disregard for the requirements of the FLSA.  A quick survey of previous cases where courts have found that employers willfully violated the FLSA confirms that any violation which occurred here fails to rise to that level.  *See, e.g., Herman v. Palo Grp. Foster Home, Inc.*, 183 F.3d 468, 474 (6th Cir. 1999)(finding a willful violation where the defendant ignored specific warnings they were out of compliance with the FLSA); *Martin v. Deiriggi,* 985 F.2d 129, 136 (4th Cir. 1992)(finding a willful violation where the defendant destroyed or withheld records to frustrate investigations into their employment practices); *Cubias v. Casa Furniture and Bedding, LLC,* No. 1:06cv386 (JCC), 2007 WL 150973, at *3 (E.D. Va. Jan 16, 2007)(finding a willful violation where

the defendant split employees' hours between two companies' books to conceal their overtime work).

Because Plaintiff cannot show a willful violation of the FLSA in this case, the two-year statute of limitations on causes of action for ordinary violation of the FLSA applies to Plaintiff's claim.  Accordingly, Plaintiff's FLSA claims are time barred and the Court grants Defendant's motion for summary judgment on Count IV.

  E. <u>Breach of Contract</u>

Plaintiff's Count V alleges that Defendant "entered into an express or implied contract with the Plaintiff to pay all wages earned," and the Defendant "breached this contract by failing to pay her the wages owed and accrued for the periods November 16, 2011 – March 7, 2012 and again from March 29, 2012 to July 7, 2012." (Compl. ¶¶ 74-76.)  Defendant argues that Plaintiff's contract claim is time barred by Virginia's three year statute of limitations on causes of action arising from oral contracts.  (Def.'s Mem. in Supp. at 27.)  However, this argument is based entirely on a mistake as to the date on which this action was filed.  Defendant is correct that this action would be time barred if it had been filed on December 24, 2015. As it was actually filed on December 24, 2014, it is not entirely time barred.

Plaintiff's argument that Plaintiff's offer letter is an employment contract is a non-starter. Virginia is an at-will employment state, and the offer letter contained a clear indication that Defendant was hiring Plaintiff as an at-will employee and it was not a contract. *See Cave Hill Corp. v. Hiers*, 264 Va. 640, 570 S.E.2d 7909, 793 (2002)("In Virginia, an employment relationship is presumed to be at-will."). However, Plaintiff may still be able to recover for time worked under a theory of implied contract and quantum meruit.

Quantum meruit recovery "is based upon an implied contract to pay the reasonable value of services rendered." *Hendrickson v. Meredith*, 161 Va. 193, 198, 170 S.E. 602, 604 (1933). "Where service is performed by one, at the instance of another, and . . . nothing is said between the parties as to compensation for such service, the law implies a contract, that the party who performs the service shall be paid a reasonable compensation therefor." *Mongold v. Woods*, 278 Va. 196, 203, 677 S.E.2d 288, 292 (2009)(quoting *Rea v. Trotter*, 67 Va. 585, 592 (1875)). Because quantum meruit is a species of implied contract, Virginia's three year statute of limitations on unwritten contracts applies. *See* Va. Code §8.010-246. As this action was brought on December 24, 2014, Plaintiff is time barred from recovering under quantum meruit for work performed before December 24, 2011.

21

The series of emails from early 2012 submitted alongside Plaintiff's supplemental affidavit demonstrate that Plaintiff was in frequent communication with executives at PPC during periods of 2012 when she did not receive a paycheck. (Pl.'s Corrected Supp. Affidavit [Dkt. 66].)  Reading these emails in the light most favorable to the Plaintiff, a reasonable juror could conclude that they corroborate the Plaintiff's claim that she was performing work for Defendant during the portions of 2012 where she did not receive a paycheck.  Accordingly, the Court denies Defendant's motion for summary judgment with respect to Plaintiff's claim for breach of implied contract.

## IV. Conclusion

For the foregoing reasons, the Court grants the Defendant's Motion for Summary Judgment in part and denies the Defendant's Motion for Summary Judgment in part.

An appropriate order will issue.

---

/s/

March  18, 2016                         James C. Cacheris
Alexandria, Virginia          UNITED STATES DISTRICT COURT JUDGE